**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-2133

PLANNED PARENTHOOD SOUTH ATLANTIC; JULIE EDWARDS, on her behalf and on behalf of all others similarly situated,

Plaintiffs – Appellees,

v.

JOSHUA BAKER, in his official capacity as Director, South Carolina Department of Health and Human Services,

Defendant – Appellant.

------------------------------

ACCESS REPRODUCTIVE CARE-SOUTHEAST; AMERICAN ACADEMY OF PEDIATRICS; AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS; AMERICAN COLLEGE OF PHYSICIANS; AMERICAN MEDICAL ASSOCIATION; CENTER FOR REPRODUCTIVE RIGHTS; IPAS; IN OUR OWN VOICE: NATIONAL BLACK WOMEN'S REPRODUCTIVE JUSTICE AGENDA; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; NATIONAL HEALTH LAW PROGRAM; NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH; SEXUALITY INFORMATION AND EDUCATION COUNCIL OF THE UNITED STATES; SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE; SOCIETY FOR MATERNAL FETAL MEDICINE; WOMEN'S RIGHTS AND EMPOWERMENT NETWORK,

Amici Supporting Appellee.

------------------------------

Appeal from the United States District Court for the District of South Carolina, at Columbia. Mary G. Lewis, District Judge. (3:18-cv-02078-MGL)

Argued: September 20, 2019

Decided: October 29, 2019

_____

Before WILKINSON, WYNN, and RICHARDSON, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Wynn and Judge Richardson joined. Judge Richardson wrote a concurring opinion.

_____

**ARGUED:** Kelly McPherson Jolley, JOLLEY LAW GROUP, LLC, Columbia, South Carolina, for Appellant. Alice Joanna Clapman, PLANNED PARENTHOOD FEDERATION OF AMERICA, Washington, D.C., for Appellees. **ON BRIEF:** Ariail B. Kirk, JOLLEY LAW GROUP, LLC, Columbia, South Carolina, for Appellant. M. Malissa Burnette, Kathleen McDaniel, BURNETTE, SHUTT & MCDANIEL, PA, Columbia, South Carolina, for Appellees. Jane Liu, Mariah Lindsay, NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM, Washington, D.C.; Julie Rikelman, Pilar Herrero, Amy Myrick, Carolina Van Der Mensbrugghe, CENTER FOR REPRODUCTIVE RIGHTS, New York , New York, for Amici Access Reproductive Care-Southeast, Center for Reproductive Rights, In Our Own Voice: National Black Women's Reproductive Justice Agenda, National Asian Pacific American Women's Forum, National Latina Institute for Reproductive Health, and Women's Rights and Empowerment Network. Janice M. Mac Avoy, Andrew B. Cashmore, Alexandra Verdi, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York, for Amici American College of Obstetricians and Gynecologists, American Medical Association, Society for Maternal Fetal Medicine, American Academy of Pediatrics, American College of Physicians, and Society for Adolescent Health and Medicine. Martha Jane Perkins, Sarah Jane Somers, NATIONAL HEALTH LAW PROGRAM, Carrboro, North Carolina, for Amici National Health Law Program, IPAS, and Sexuality Information and Education Council of the United States.

_____

WILKINSON, Circuit Judge:

This case raises a question of statutory construction. We ask whether, and on what basis, the Medicaid Act's free-choice-of-provider provision affords a private right of action to challenge a state's exclusion of a healthcare provider from its Medicaid roster. The district court here issued a preliminary injunction in favor of the individual plaintiff, a Medicaid recipient, in her suit challenging South Carolina's decision to terminate Planned Parenthood South Atlantic's (PPSAT) provider agreement because it offers abortion services. The plaintiff was likely to succeed on the merits of this claim, the district court held, for two interrelated reasons: first, the Medicaid Act's free-choice-of-provider provision, 42 U.S.C. § 1396a(a)(23)(A), confers on "any individual" a private right to sue that may be enforced under 42 U.S.C. § 1983; and second, South Carolina denied plaintiff the right to select the willing, qualified family-planning provider of her choice.

We now affirm. Based on the Supreme Court's precedents, Congress's intent to create an individual right enforceable under § 1983 in the free-choice-of-provider provision is unambiguous. In addition, a plain-language reading of the provision's mandate—that states "must" furnish Medicaid recipients the right to choose among providers "qualified to perform the service or services required"—bars states from excluding providers for reasons unrelated to professional competency. *See* 42 U.S.C. § 1396a(a)(23)(A), (p)(1). Finding the remaining preliminary injunction factors satisfied, we shall uphold the trial court's judgment.

I.

A.

Medicaid is the nation's public health insurance program for those of limited means. The original beneficiaries of this program were low-income children and their parents, the indigent elderly, the blind, and the disabled. *Schweiker v. Gray Panthers,* 453 U.S. 34, 37 (1981). Since 1965, Congress has periodically expanded the program, adding, for instance, pregnant women with family incomes up to 133% of the federal poverty level as a distinct beneficiary class. *See* 42 U.S.C. § 1396a(a)(10)(A)(i), (*l*); Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, § 302, 102 Stat. 683, 750; Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6401, 103 Stat. 2106, 2258.

A joint federal-state effort ensures that the healthcare needs of these beneficiaries are met. In broad strokes, the Medicaid Act "offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions." *Armstrong v. Exceptional Child Ctr.*, 135 S. Ct. 1378, 1382 (2015). The Act, to that end, charges the federal government with crafting baseline eligibility requirements for recipients and providers, determining covered medical services, and establishing reimbursement standards to the states. *See* 42 U.S.C. § 1396 *et seq.*; *NFIB v. Sebelius*, 567 U.S. 519, 541-42 (2012). Cooperating states then implement the program, agreeing to abide by federal conditions in return for federal matching funds that are used for expenses such as provider reimbursements. *See Armstrong*, 135 S. Ct. at 1382. Such funds are substantial; federal coffers finance anywhere from fifty to eighty-

three percent of state expenses, 42 U.S.C. § 1396d(b), an aggregate figure that accounts for over ten percent of most states' total revenue, *NFIB*, 567 U.S. at 542.

Congress designed the Medicaid program to ensure that states dispense federal funds in compliance with federal rules. At the outset, states must propose and submit Medicaid plans for the approval of the Centers for Medicare and Medicaid Services. *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 610 (2012). State departures from federal requirements provide grounds for the Secretary of Health and Human Services (HHS) to withhold Medicaid funding, either in whole or in part. *See* 42 U.S.C. § 1396c; 42 C.F.R. § 430.12(c). If federal requirements are met, however, states have "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (quoting 42 U.S.C. § 1396a(a)(19)).

At issue here is the Medicaid Act's free-choice-of-provider provision, 42 U.S.C. § 1396a(a)(23), which states:

> A State plan for medical assistance must— provide that any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services . . . .

42 U.S.C. § 1396a(a)(23)(A). That provision guarantees patients access to qualified and willing providers. A state plan must generally allow Medicaid recipients to obtain care from any provider who is "qualified to perform the service or services required" and "who undertakes to provide . . . such services."

In its mechanics, the free-choice-of-provider provision comports with the Medicaid

5

Act's dual emphasis on federal standard-setting and state flexibility. While Medicaid beneficiaries may generally seek medical services from willing providers of their choice, states retain discretionary authority to determine whether entities are medically "qualified to perform the service or services required." States may also exclude providers from their plans "for any reason for which the [federal] Secretary of [Health and Human Services] could exclude the individual or entity," 42 U.S.C. § 1396a(p)(1), or on certain state-law grounds, *see* 42 C.F.R. § 431.51(c)(2).

B.

This dispute arose following South Carolina's termination of two Planned Parenthood centers as Medicaid providers. PPSAT operates two healthcare centers in South Carolina, one in Charleston and the other in Columbia. These centers provide a range of family planning and preventative care services, including physical exams, cancer screenings, contraceptive counseling, and pregnancy testing. For four decades, PPSAT has been a South Carolina Medicaid provider that receives reimbursements for care provided to Medicaid beneficiaries. In recent years, PPSAT's South Carolina centers have treated hundreds of patients insured through Medicaid annually.

Among those patients is the individual plaintiff in this case, who suffers from diabetes and its resulting complications. J.A. 75-78. Because doctors have advised that these complications would make it quite dangerous for her to carry a pregnancy to term, the plaintiff considers it imperative that she have access to safe, effective birth control. After the plaintiff had difficulty finding a doctor who accepted Medicaid patients and was willing to provide her preferred form of birth control, she turned to PPSAT's Columbia

6

center. At her PPSAT appointment, the doctors inserted an intrauterine device to prevent pregnancy and informed her that her blood pressure was elevated. As a result, she sought follow-up care from her endocrinologist to control her blood pressure. Because the plaintiff was impressed with the care she received at PPSAT, she planned to switch her gynecological and reproductive health care there.

In July 2018, South Carolina's Department of Health and Human Services (SCDHHS) terminated PPSAT's Medicaid provider agreement. SCDHHS did not contend that PPSAT was providing subpar service to its Medicaid patients, or to any other patients. Instead, PPSAT was terminated solely because it performed abortions outside of the Medicaid program.[1]

According to SCDHHS, PPSAT's termination was part of a plan by Governor Henry McMaster designed to prevent the state from indirectly subsidizing abortion services. In 1995, the South Carolina legislature passed a law preventing state funds appropriated for family planning services from being used to fund abortions. S.C. Code Ann. § 43-5-1185 (1995). After taking office in 2017, Governor McMaster issued two executive orders designed to further this objective. The first, Executive Order 2017-15, directed state agencies "to take any and all necessary actions . . . to the extent permitted by law, to cease providing State or local funds . . . to any physician or professional medical practice

---

[1] South Carolina does not provide Medicaid reimbursements for abortion services except in cases where it is required to do so by federal law. Such cases involve rape, incest, or the need to protect the mother's life. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, tit. V, §§ 506-507, 132 Stat. 348, 763-64 (Hyde Amendment).

affiliated with an abortion clinic . . . ." J.A. 56-58. The second, Executive Order 2018-21, directed SCDHHS to "deem abortion clinics . . . and any affiliated physicians or professional medical practices . . . that are enrolled in the Medicaid program as unqualified to provide family planning services and, therefore, to immediately terminate them . . . ." J.A. 70-71. SCDHHS responded quickly. On the day the second order was issued, SCDHHS Officer of Health Programs Amanda Williams notified PPSAT by letter that "[t]he Governor's actions result in Planned Parenthood no longer being qualified to provide services to Medicaid beneficiaries" and that PPSAT's enrollment agreement with South Carolina was terminated effective immediately. J.A. 73. As a result, PPSAT's two South Carolina centers began to turn away Medicaid patients. J.A. 13-14.

C.

On July 27, 2018, PPSAT and the individual plaintiff (collectively, "plaintiffs") filed suit in federal district court in South Carolina against Joshua Baker, in his official capacity as Director of SCDHHS. The individual plaintiff brought suit on her own behalf and that of a purported class of South Carolina Medicaid beneficiaries who received, or would like to receive, healthcare services at PPSAT. Plaintiffs brought this action under 42 U.S.C. § 1983, seeking injunctive and declaratory relief on the grounds that SCDHHS violated their rights under the Medicaid Act and the Fourteenth Amendment. On July 30, plaintiffs filed for preliminary injunctive relief solely on the basis of their Medicaid Act claims. The district court held hearings on plaintiffs' motion on August 23. In their complaint and at the hearing, plaintiffs argued that the Medicaid Act's free-choice-of-provider provision confers on recipients a private right, enforceable under 42 U.S.C.

8

§ 1983, to use the qualified and willing provider of their choice, and that South Carolina violated this right when it terminated PPSAT for reasons unrelated to its professional competence to provide medical services.

The district court agreed with the plaintiffs and granted a preliminary injunction on August 28, 2018. Because the district court held that injunctive relief was appropriate based on the individual plaintiff's Medicaid Act claim alone, it did not analyze PPSAT's Medicaid Act claim. First, it held that the individual plaintiff's Medicaid Act claim was likely to succeed on the merits. It agreed that the free-choice-of-provider provision confers a private right, enforceable under 42 U.S.C. § 1983, on Medicaid-eligible patients, guaranteeing their right to choose any willing provider "qualified to perform" the relevant service. Critically, the court held that "qualified" should be given its ordinary meaning— professionally competent. Relatedly, the district court rejected South Carolina's contention that § 1396a(p)(l) of the Medicaid Act gives a state plenary authority to exclude providers from its program "for any reason whatsoever as long as the reason is bolstered by State law." *Planned Parenthood S. Atl. v. Baker*, 326 F. Supp. 3d 39, 47-48 (D.S.C. 2018). To the contrary, it held that the state's authority to exclude providers is limited by the free-choice-of-provider provision.

Finally, the district court found that the other conditions necessary for a preliminary injunction—irreparable harm, balancing of the equities, and the public interest—were satisfied. In weighing the equities, the district court rejected South Carolina's argument that the state would be forced to subsidize abortions if it were enjoined from terminating PPSAT's provider agreement. *Baker*, 326 F. Supp. 3d at 49-50. First, because South

9

Carolina's Medicaid program does not cover abortions except in the narrow circumstances required by federal law, there was no direct subsidization of non-covered abortions. *See id.* at 47. Second, because "PPSAT is reimbursed for Medicaid services on a fee-for-service basis," *id.* at 49, at rates that do not cover its costs, PPSAT's participation in Medicaid did not generate excess funds that could be used to indirectly subsidize abortions. *See id.* at 47, 49-50. Accordingly, the district court granted a preliminary injunction preventing South Carolina from terminating PPSAT's Medicaid enrollment agreement.

South Carolina timely appealed.

## II.

The free-choice-of-provider provision lies at the heart of this appeal. As noted above, the provision states that:

> A State plan for medical assistance *must*— provide that *any individual* eligible for medical assistance (including drugs) *may obtain* such assistance from *any institution*, agency, community pharmacy, or person, *qualified to perform the service or services required* (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services . . . .

42 U.S.C. § 1396a(a)(23)(A) (emphases added).

It is difficult to imagine a clearer or more affirmative directive. The provision applies to "*any* individual" eligible for Medicaid; grants these individuals the right to obtain medical treatment from "*any* institution" willing and "qualified to perform the service or services required"; and provides that state plans "*must*" comply.[2]

---

[2] Violation of a Medicaid recipient's statutory right under the free-choice-of-provider provision visits "concrete" harm that is "real" and "tangible," because the (Continued)

10

Congress could have made an exception for providers offering abortion services. But it did not do so. Because we "presume that a legislature says in a statute what it means and means in a statute what it says there," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992), this court cannot write into a statute an exception that Congress did not create. Accordingly, we take the free-choice-of-provider provision to mean that a Medicaid recipient has the right to challenge a state's exclusion of a provider from its Medicaid plan on grounds unrelated to that provider's willingness and professional competency to furnish the required medical service.

III.

A.

It is important at the outset to place this case in proper context. As a matter of black letter law, inferring a private right of action is a matter of statutory interpretation. If Congress is silent or ambiguous, courts may not find a cause of action "no matter how desirable that might be as a policy matter." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).

But it was not always this way, and a brief overview of this history is useful background to the present lawsuit. We begin with *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), where the Supreme Court stated that federal courts were partners of Congress, making it "the duty of the courts to be alert to provide such remedies as are necessary to

recipient can no longer receive care at his or her provider of choice. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548-49 (2016). This is the exact harm that Congress intended the provision to prevent. *See id.*

make effective the congressional purpose" expressed by a statute. *Id.* at 433. During the *Borak* era, the "exercise of judicial power" was not "justified in terms of statutory construction," but rather as a means of crafting "substantive social policy." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 402, 402 n.4 (1971) (Harlan, J., concurring in judgment).

Some years later, Justice Powell derided *Borak*'s approach in an oft-quoted dissent. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 742 (1979) (Powell, J., dissenting). In Powell's view, freely implying private rights of action posed two related constitutional problems. First, to infer from silence the right to file suit in federal court interferes with Congress's Article III power to set "the jurisdiction of the lower federal courts." *Id.* at 730. Second, an expansive approach to implied private rights of action "cannot be squared with the doctrine of the separation of powers." *Id.* This is because a court's "substitut[ion of] its own views as to the desirability of private enforcement," *id.* at 740, dispatches Congress's Article I "policymaking authority" to the Third Branch of government, *id.* at 743. "When Congress chooses not to provide a private civil remedy, federal courts should not assume the legislative role of creating such a remedy and thereby enlarge their jurisdiction." *Id.* at 730-31. Therefore, "[a]bsent the most compelling evidence of affirmative congressional intent, a federal court should not infer a private cause of action." *Id.* at 731.

Justice Powell's dissent primed the Court for a doctrinal about-face. The Court incrementally swore "off the habit of venturing beyond Congress's intent," *Sandoval*, 532 U.S. at 286-87 (tracing this doctrinal evolution), instead limiting its focus to the specific statutory text at issue. In *Sandoval*, the Court summed up the result of this doctrinal

12

progression: "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* at 286.

But there was a loose end remaining—what to do with implied rights of action brought under § 1983. Some litigants argued that § 1983 provided plaintiffs with a separate cause of action if they fell "within the general zone of interest" of a federal statute. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282-83 (2002) (citing *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997)). The Court swiftly corrected this misunderstanding in *Gonzaga*, instructing that § 1983 creates a cause of action to enforce a federal statute only when the underlying statute itself unambiguously "confers an individual right" on the plaintiff. *Id.* at 284-85. If so, the § 1983 remedy follows as a matter of course; litigants need not separately demonstrate Congress's intent to create a private remedy. *Id.*

B.

With this background as guidance, we review the district court's entry of a preliminary injunction for "abuse of discretion, accepting the court's findings of fact absent clear error, but reviewing its conclusions of law *de novo*." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*, 373 F.3d 589, 593 (4th Cir. 2004). To that end, the individual plaintiff "must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We are mindful at once that a preliminary injunction is an "extraordinary remedy," *id.* at 22, but its issuance "is

13

committed to the sound discretion of the trial court," *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (quoting *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989)).

IV.

First we consider the threshold question whether the Medicaid Act's free-choice-of-provider provision creates a private right enforceable under § 1983. Section 1983 creates a federal remedy against anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Of course, it "does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). Rather a plaintiff seeking redress "must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing*, 520 U.S. at 340.

Three factors guide us in determining whether a statute creates a private right enforceable under § 1983. *Id.* at 340-41. "First, Congress must have intended that the provision in question benefit the plaintiff." *Id.* at 340. "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Id.* at 340-41. "Third, the statute must unambiguously impose a binding obligation on the States" by speaking "in mandatory, rather than precatory, terms." *Id.* at 341. If these three factors are satisfied, there is "a rebuttable presumption that the right is enforceable under § 1983," *id.*, which may be defeated by showing that Congress expressly or implicitly foreclosed a § 1983 remedy, *City of Rancho Palos Verdes*, 544 U.S. at 120.

14

Applying these principles, we agree with the district court—and five of our six sister circuits to have addressed this issue—that the free-choice-of-provider provision confers a private right, enforceable under § 1983, on Medicaid recipients. *See Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1224 (10th Cir. 2018); *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 965-66 (9th Cir. 2013); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 968, 972-74 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456, 461 (6th Cir. 2006). *But see Does v. Gillespie*, 867 F.3d 1034, 1037, 1041, 1046 (8th Cir. 2017).

Taking the first *Blessing* factor, the free-choice-of-provider provision "unambiguously gives Medicaid-eligible patients an individual right" to their choice of provider qualified to perform a medical service. *Planned Parenthood of Ind.*, 699 F.3d at 974. The provision has an "unmistakable focus," *Gonzaga*, 536 U.S. at 284, on its intended class of beneficiaries: "any individual eligible for medical assistance" under the Medicaid Act, 42 U.S.C. § 1396a(a)(23)(A). *See Doe v. Kidd*, 501 F.3d 348, 356 (4th Cir. 2007) (finding that 42 U.S.C. § 1396a(a)(8), which refers to "all individuals wishing to make application for medical assistance," confers an individual right).

Congress's use of the phrase "any individual" is a prime example of the kind of "rights-creating" language required to confer a personal right on a discrete class of persons—here, Medicaid beneficiaries. *See, e.g.*, *Sandoval*, 532 U.S. at 288 (providing an example of rights-creating language: "No person . . . shall . . . be subjected to discrimination . . . ."). Put differently, by adopting as its benchmark whether the "needs of

15

any particular person have been satisfied," *Gonzaga*, 536 U.S. at 288, Congress left no doubt that it intended to guarantee each Medicaid recipient's free choice of provider.

As for the second *Blessing* factor, the free-choice-of-provider provision is not so "vague and amorphous," *Blessing*, 520 U.S. at 340-41, that its enforcement would strain judicial competence. The provision protects the right of a Medicaid recipient to seek care from his or her provider of choice, subject to two criteria: (1) the provider must be "qualified to perform the service or services required," and (2) the provider must "undertake[] to provide [the recipient] such services." 42 U.S.C. § 1396a(a)(23)(A). These criteria are objective. The second is "a simple factual question no different from those courts decide every day." *Betlach*, 727 F.3d at 967. And the first, which "may require more factual development or expert input," still falls squarely "within the range of judicial competence." *Id.*

In an attempt to create ambiguity, South Carolina focuses on the word "qualified" in isolation, Appellant's Reply Brief at 9-10, ignoring the reality that the term is "tethered to an objective benchmark: 'qualified *to perform the service or services required.*'" *Betlach*, 727 F.3d at 967-68 (quoting 42 U.S.C. § 1396a(a)(23)(A)). That omission makes all the difference. Courts can "readily determine" whether a provider is qualified to perform a service by "drawing on evidence such as descriptions of the service required; state licensing requirements; the provider's credentials, licenses, and experience; and expert testimony regarding the appropriate credentials for providing the service." *Id.* at 968. This

16

factual determination "is no different from the sorts of qualification or expertise assessments that courts routinely make in various contexts." *Id.*[3]

Finally, the free-choice-of-provider provision "unambiguously impose[s] a binding obligation on the States." *Blessing*, 520 U.S. at 341. Under the provision, states "must provide" a Medicaid recipient with his or her choice of provider qualified to perform the service at issue. 42 U.S.C. § 1396a(a)(23)(A). Thus the provision is "couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 341; *see also Kidd*, 501 F.3d at 356 (holding, as mandatory, a Medicaid provision requiring that state plans "must" provide for reasonably prompt medical assistance).

Since the three *Blessing* factors are satisfied, the individual plaintiff benefits from a rebuttable presumption that the free-choice-of-provider provision is enforceable under § 1983. *Blessing*, 520 U.S. at 341. That presumption has not been overcome. As an initial matter, nowhere in the Medicaid Act did Congress declare an express intent to "specifically foreclose[] a remedy under § 1983." *Id.* (internal quotations omitted).

Nor can such an intent be implied: the Medicaid Act does not contain a "comprehensive enforcement scheme . . . incompatible with individual enforcement under § 1983." *Id.* Because South Carolina assumed that the free-choice-of-provider requirement did not confer an individual right, it did not expressly press a rebuttal argument before this

---

[3] A distinct note of caution is in order. To say that the term "qualified" is susceptible to federal judicial measurement for purposes of the second prong of *Blessing* is not the same thing as saying that states lack discretion in defining professional qualifications under 42 U.S.C. § 1396a(p)(1), or that they are not due deference in their termination decisions. *See infra* Section VI.B. In this case, PPSAT's qualifications are simply not in dispute.

court. Even if it had, we conclude that the Medicaid Act's enforcement scheme is not sufficiently "comprehensive" to foreclose a private right of action enforceable under § 1983. Three alternative remedies are provided for in the Act: (1) the Secretary of HHS's authority to review state Medicaid plans for noncompliance and curtail or cut off Medicaid funding as a matter of discretion, 42 U.S.C. §§ 1316(a), 1396c; 42 C.F.R. § 430.12; (2) a state administrative process for providers to challenge termination decisions, 42 U.S.C. § 1396a(a)(4); 42 C.F.R. § 1002.213; and (3) a state administrative process for Medicaid recipients to challenge a claim denial, 42 U.S.C. § 1396a(a)(3).

These remedies, taken together, are quite different from the "unusually elaborate enforcement provisions" that the Supreme Court has taken as evidence that Congress intended to preclude individual enforcement under § 1983. *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13-14 (1981). The relevant pollution control statute at issue in *Middlesex County* is illustrative. That statute authorized governmental officials to respond to violations of the act with compliance orders and civil suits; permitted the imposition of penalties up to $10,000 per day; and made criminal penalties available. *Id.* at 13. Separately, the act also conferred on "any interested person" the right to seek judicial review of relevant acts by federal officials, such as the issuance of an effluent permit. *Id.* at 13-14. By prescribing the particular remedies available to public and private actors, Congress demonstrated its intent to foreclose forms of relief otherwise available to plaintiffs bringing § 1983 claims. *See id.* at 14-15.

Nothing comparable to this detailed enforcement scheme exists in the Medicaid Act. To state the obvious, individuals are not ordinarily plaintiffs in provider suits, and an

18

individual's administrative remedy to challenge, for example, a denial of Medicaid coverage for a particular "service" does not also provide a forum for contesting the disqualification of a preferred provider. This much is clear to South Carolina, so it seems to latch onto the Secretary's ability to cut Medicaid funds as itself indicative of a comprehensive administrative enforcement scheme. *See* Appellant's Opening Brief at 26-27. But a remedy is not comprehensive solely because it is drastic, and to view a wholesale cutoff of funding to the states as vindicating the interests of individual Medicaid beneficiaries in their choice of provider would be illogical.

The illogic of this argument aside, the Supreme Court has already held that the Medicaid Act's administrative scheme is not sufficiently comprehensive to foreclose a private right of action enforceable under § 1983. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 521-22 (1990); *see also Kidd*, 501 F.3d at 356 (holding that the Medicaid Act neither explicitly nor implicitly "forbid[s] recourse to § 1983"). The Court's decision in *Gonzaga* cut back on *Wilder*'s treatment of implied rights of action in the § 1983 context; specifically, *Gonzaga* clarified that Congress must create an "unambiguously conferred right" rather than merely confer a "benefit" on a plaintiff to establish a cause of action enforceable under § 1983. *Gonzaga*, 536 U.S. at 282. But *Wilder*'s reasoning as to the comprehensiveness of the Medicaid Act's enforcement scheme has not been overturned. *See Andersen*, 882 F.3d at 1229, 1229 n.16 (recognizing the same).

In sum, the Medicaid Act's enforcement scheme is not sufficiently "comprehensive" because, inter alia, it does not provide a private remedy—either judicial or administrative—

for patients seeking to vindicate their rights under the free-choice-of-provider provision.[4] *See City of Rancho Palos Verdes*, 544 U.S. at 121 ("[I]n *all* of the cases in which we have held that § 1983 *is* available for violation of a federal statute, we have emphasized that the statute at issue . . . *did not* provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated."). The reason Congress did not specify a method of private enforcement is plain: Section 1983 was to be the remedy for patients seeking to enforce their rights under the free-choice-of-provider provision. Permitting private enforcement of this type of suit, Congress realized, "in no way interferes" with the Secretary of HHS's authority to audit and sanction noncompliant state Medicaid plans. *Planned Parenthood of Ind.*, 699 F.3d at 975.

Thus, the Medicaid Act provides no comprehensive enforcement scheme sufficient to overcome the presumption that the free-choice-of-provider provision is enforceable under § 1983. *Blessing*, 520 U.S. at 341. The plain, direct language of that provision unmistakably confers on a discrete class of individual Medicaid beneficiaries the right to seek medical assistance from any qualified medical provider who is willing to provide the required medical service. If that language does not suffice to confer a private right,

---

[4] South Carolina's contention that the individual plaintiff had a state administrative remedy she was required to exhaust before bringing a § 1983 suit is misguided. "[A]s a general rule, a plaintiff bringing a suit pursuant to 42 U.S.C. § 1983 does not have to exhaust state administrative remedies before filing suit in federal court." *Talbot v. Lucy Corr Nursing Home*, 118 F.3d 215, 218 (4th Cir. 1997) (citing *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 512 (1982)). At any rate, we agree with the district court that even if the individual plaintiff had a state administrative remedy available to her, it would, given the circumstances here, be futile. *Baker*, 326 F. Supp. 3d at 46-47.

20

enforceable under § 1983, upon the plaintiff here, it is difficult to see what language would be adequate. To hold in South Carolina's favor here would simply be to remove § 1983 as a vehicle for private rights enforcement and essentially to require Congress to set forth a cause of action enforceable purely on its own terms. We do not believe that the Court has channeled the expression of congressional intent in such a fashion, nor do we believe that we are free to do so. *See Blessing*, 520 U.S. at 340-41. Because South Carolina has not rebutted the presumption that a private right of action exists, we join the Fifth, Sixth, Seventh, Ninth, and Tenth Circuits in finding that the free-choice-of-provider provision creates a private right enforceable under § 1983. *See Andersen*, 882 F.3d at 1224; *Gee*, 862 F.3d at 457; *Betlach*, 727 F.3d at 965-66; *Planned Parenthood of Ind.*, 699 F.3d at 968, 972-74; *Harris*, 442 F.3d at 461. *But see Gillespie*, 867 F.3d at 1041, 1046.

V.

We are mindful of two principal, and principled, objections to according the plaintiff her requested relief. First, we should not freely infer private rights of action that are enforceable under § 1983. Second, because Spending Clause legislation is in the nature of a contract, we should not construe it so as to ambush states with terms that the states did not foresee or bargain for. These are doctrines of importance and great force, but both presuppose some level of textual ambiguity. Because that ambiguity is absent here, we begin and end our search for Congress's intent with the plain text of the free-choice-of-provider provision.

First, courts are most definitely not at liberty to imply private rights of action willy-nilly. Congress's intent to make a private right enforceable under § 1983 must be

21

"unmistakably clear." *Gonzaga*, 536 U.S. at 286 (internal citations omitted). This requirement ensures that courts enforce private rights under § 1983 only when Congress has so intended. Here, Congress unambiguously intended to create a private right—in favor of "any individual" receiving Medicaid assistance—in the free-choice-of-provider provision. Medicaid recipients, it is clear, are not merely within the provision's "general zone of interest." *See id.* at 283.

We do not reach this conclusion lightly, but only after closely examining Congress's intent underlying the "specific statutory provision" at issue. *Blessing*, 520 U.S. at 342-43. South Carolina reaches beyond the plain and narrow text of the free-choice-of-provider provision—to eighty-two other provisions in the Medicaid Act—to conclude that the provision is no more than a "plan requirement," rather than an individual right. Appellant's Opening Brief at 23. However, Congress foreclosed any argument that an individual plan requirement in the Medicaid Act cannot be enforceable through an implied private right of action. 42 U.S.C. § 1320a–2 (A provision "is not to be deemed unenforceable because of its inclusion in a section of [the Act] . . . specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements . . . ."). Quite apart from that clause, however, ignoring Congress's clearly expressed intent to create a private right of action here is no less a usurpation of Congress's "policymaking authority," *see Cannon*, 441 U.S. at 743 (Powell, J., dissenting), than reading a cause of action into a statute where Congress did not create one, *see Borak*, 377 U.S. at 433.

22

Second, courts must be especially cautious in finding that a provision in Spending Clause legislation, such as the Medicaid Act, creates a private right enforceable under § 1983. Spending Clause legislation, as noted, has been likened to a contract: "[I]n return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Since a state cannot voluntarily and knowingly accept conditions unknown to it, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*

So much is true here. The terms of the Medicaid agreement are clear; in return for substantial federal funds, states are required to comply with the unambiguous terms of the free-choice-of-provider provision. And for the reasons described above, this obligation is enforceable by recipients, the intended beneficiaries of the provision. When, as here, the private cause of action is "unambiguously conferred" on a third party, *see Armstrong*, 135 S. Ct. at 1388 (plurality), courts cannot deprive the sovereign signatories to a "contract" such as the Medicaid Act of the benefit of their bargain.

Nor may courts relieve them of the agreement's consequences. Here, South Carolina would like to avoid the obligations imposed by this fair bargain. In essence, the state argues that some Supreme Court decisions might suggest a move away from inferring private rights of action in Spending Clause legislation. *See, e.g.*, Appellant's Opening Brief at 29-30 ("The [*Gonzaga*] Court noted that '[m]ore recent decisions have rejected attempts to infer enforceable rights from Spending Clause statutes.'") (quoting *Gonzaga*, 536 U.S. at

23

281). South Carolina may or may not be correct in its doctrinal forecast, but for now its argument remains speculative and conjectural. As the Seventh Circuit noted:

> [N]othing in *Armstrong*, *Gonzaga*, or any other case we have found supports the idea that plaintiffs are now flatly forbidden in section 1983 actions to rely on a statute passed pursuant to Congress's Spending Clause powers. There would have been no need, had that been the Court's intent, to send lower courts off on a search for "unambiguously conferred rights." A simple "no" would have sufficed.

*BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 820-21 (7th Cir. 2017). We agree. At bottom, the Court's cases require us to find an "unambiguously conferred" right, *Armstrong*, 135 S. Ct. at 1387-88 (plurality), which is exactly what we have done here. In the end, the concerns identified above are not controlling in this case, because the free-choice-of-provider provision unambiguously creates a private right in favor of the individual plaintiff.

VI.

Having decided that Congress unambiguously intended to create a private right of action in the free-choice-of-provider provision, we turn now to consider the scope of the right it confers on Medicaid recipients. A reasoned textual analysis in this case requires only two steps. First, "[a]s always, we start with the specific statutory language in dispute." *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018). In the free-choice-of-provider provision, "qualified to perform the service or services required" means what it says: professionally fit to perform the medical services the patient requires. Second, we look to § 1396a(p)(1), which describes a state's authority to exclude providers from its Medicaid plan. In the end, we find that the free-choice-of-provider provision in § 1396a(a)(23)(A) and the state's

24

discretionary authority under § 1396a(p)(1) work in tandem to accomplish Congress's overall objectives in this cooperative federalism scheme.

A.

First principles guide us in deciding what it means for a provider to be "qualified to perform the service or services required" under the free-choice-of-provider provision. "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). Because the Medicaid Act does not define the term "qualified," we consider its plain meaning—namely, "having an officially recognized qualification to practice as a member of a particular profession; fit, competent." Oxford English Dictionary (3d ed. 2007); *see also* Black's Law Dictionary 1360 (9th ed. 2009) (defining "qualified" as "[p]ossessing the necessary qualifications; capable or competent").

Every circuit to have considered this issue is in accord with that straightforward definition. *See, e.g.*, *Andersen*, 882 F.3d at 1230; *Gee*, 862 F.3d at 459-60; *Betlach*, 727 F.3d at 967-68; *Planned Parenthood of Ind.*, 699 F.3d at 978. *But see Gillespie*, 867 F.3d at 1046 (declining to reach this question after concluding that the free-choice-of-provider provision does not provide patients with a private right of action enforceable under § 1983).

South Carolina does not contest the fact that PPSAT is professionally qualified to deliver the services that the individual plaintiff seeks. Nowhere in its submissions to this court does the state seek to raise doubts that PPSAT satisfies the ordinary definition of "qualified" as being professionally capable or competent. Instead, the state seeks to persuade us that "qualified" means something other than what it says or that the structure

25

of the statute as a whole entrusts the word to the states to define its meaning.

The term, however, is in a federal statute and we are obliged to give it the meaning that Congress intended, so long as that meaning is clear to its state partners in this cooperative program. There is no question that the ordinary meaning of the term "qualified" is the one Congress intended. Were there any doubt as to its intent, Congress provided more specificity in the terms surrounding "qualified." The free-choice-of-provider provision guarantees Medicaid recipients the right to "obtain [medical] assistance from any institution, agency . . . or person[] qualified *to perform the service or services required*." 42 U.S.C. § 1396a(a)(23)(A) (emphasis added). The plain import of this language is to tie the word "qualified" to the performance of a service—and not just any service, but a medical service. Tellingly, the statute does not differentiate among different types of medical services, laying bare what can be the only reasonable interpretation of "qualified" in this context: capable of "carry[ing] out a particular *activity*—'perform[ing] the [medical] service' that a given Medicaid recipient requires.'" *Betlach*, 727 F.3d at 969. It follows that the types of "qualifications" that are intended relate to a provider's competency to perform a particular medical service, and not to any conceivable state interest as applied to the Medicaid program.

Reading "qualified to perform" in the free-choice-of-provider provision to mean professionally competent accords with the way Congress ordinarily uses the phrase. *See Mount Lemmon Fire Dist. v. Guido*, 139 S. Ct. 22, 26 (2018) (finding it "instructive" that a phrase "occurs dozens of times throughout the U.S. Code, typically carrying [its ordinary meaning]"). Consider, for example, 8 U.S.C. § 1188(c)(3), which directs the Secretary of

Labor to find that "there are not sufficient workers in the United States who are able, willing, and qualified to perform the labor or service needed" before admitting temporary H-2A workers. This provision, like many others in the U.S. Code, specifies some service or function as the object of the phrase "qualified to perform." *See, e.g.*, 49 U.S.C. § 5329(e) (awarding states funding to carry out a federal public transportation safety program if, among other things, members of the state agency "responsible for rail fixed guideway public transportation safety oversight" are "qualified to perform such functions through appropriate training"); 37 U.S.C. § 301b(b)(3) (defining "covered officers" as including those "qualified to perform operational flying duty"). To read the phrase as denoting anything other than fitness to perform the activity identified would be highly unusual.

In short, Congress's handiwork here makes good sense. As a matter of ordinary English, one's preferred dry cleaner is not made unqualified to perform cleaning services because he disfavors bicycles or because he did not vote in the last state election, even though the state may prefer otherwise. Yet that is precisely the sort of result produced by South Carolina's reading of "qualified," which would allow the state to exclude providers based on any conceivable state interest. PPSAT, as South Carolina all but admits, is perfectly competent to perform the family-planning services required by plaintiff and is licensed to do so. The state nevertheless suggests that it may disqualify a competent provider under state law so long as there is "good reason." *See* Appellant's Opening Brief at 24. Today that reason is PPSAT's provisioning of abortion services, but we cannot glean any principled limit to the state's exclusion authority under South Carolina's interpretation.

And there's the rub. If credited, South Carolina's submission that the term

27

"qualified" means whatever the state says would strip the free-choice-of-provider provision of all meaning and shortchange the federal side of the bargain. South Carolina argues the provision would still have *some* meaning by ensuring that recipients could see any provider that meets the state's qualifications. But we do not believe that Congress could have intended to confer a right so empty in terms so strong. "If the states are free to set any qualifications they want—no matter how unrelated to the provider's fitness to treat Medicaid patients—then the free-choice-of-provider requirement could be easily undermined by simply labeling any exclusionary rule as a 'qualification.'" *Planned Parenthood of Ind.*, 699 F.3d at 978.

South Carolina nonetheless contends that the Medicaid Act's silence as to the meaning of "qualified" is grounds for interpreting it to allow states expansive exclusionary powers. *See* Appellant's Reply Brief at 10 ("Congress leaving the term 'qualified' undefined purposely creates a vague or amorphous provision with the idea being that doing so allows the states to tailor their State Plan."). That, however, is not how we ordinarily interpret undefined statutory terms, let alone a term pegged to a phrase as clear as "to perform the [medical] service or services required." 42 U.S.C. § 1396a(a)(23)(A).

The state next seeks refuge in the canon against surplusage. If "qualified" means professionally competent, South Carolina argues, then its inclusion in the free-choice-of-provider provision is "pointless and redundant" because state licensing schemes already exclude incompetent providers from the Medicaid pool. *See* Appellant's Reply Brief at 13. But this view ignores the language of the free-choice-of-provider provision. We do not lightly impute to Congress an intent to use terms that "have no operation at all." *Marbury*

28

*v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). And as noted above, South Carolina's reading works precisely this result by allowing states—at their discretion—to nullify the free-choice-of-provider provision entirely. Granted, South Carolina agrees that a state's policies cannot eliminate "all recipient choice," which the state interprets to require only that at least two "qualified" providers remain available. *See* Appellant's Opening Brief at 36-37. But that cannot be right. The free-choice-of-provider provision "does not simply bar the states from ending *all* choice of providers, it guarantees to every Medicaid beneficiary the right to choose *any* qualified provider." *Planned Parenthood of Ind.*, 699 F.3d at 979. In order to do that, a state must be restricted in its ability to terminate providers for reasons unrelated to professional competency.

The case law also does not support South Carolina's position. On this front, the state argues that the Court's decision in *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980), interpreted the free-choice-of-provider provision to apply only to providers that "continue[] to be qualified" in the Medicaid program as a matter of state law. Appellant's Opening Brief at 35 (quoting *O'Bannon*, 447 U.S. at 785). Not so. *O'Bannon* spoke to the narrow question whether residents of a nursing home had a right to a pre-termination hearing before the state could close a home that all parties agreed was professionally "unqualified" to render patient care. *See* 447 U.S. at 775-76; *see also id.* at 776 n.3 (cataloguing the home's noncompliance with statutes governing, among other topics, nursing services, physical environment, and medical records). In point of fact, the patients there did not bring a substantive claim seeking to vindicate their rights under the free-choice-of-provider provision, but rather sued for violation of their procedural due process

29

rights. *Id.* at 775. Along with three of the four circuits to have addressed this issue, we cannot read *O'Bannon* to resolve the very different claim raised by plaintiff in the instant case. *See Andersen*, 882 F.3d at 1231-32; *Gee*, 862 F.3d at 460-61; *Planned Parenthood of Ind.*, 699 F.3d at 977. *But see Gillespie*, 867 F.3d at 1047 (Shepherd, J., concurring).

B.

Although the free-choice-of-provider provision imposes limits on a state's qualification authority, states retain discretionary authority with regards to healthcare providers. Section 1396a(p)(1) speaks to this balance, providing:

> In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary [of Health and Human Services] could exclude the individual or entity from participation in a program under subchapter XVIII under section 1320a–7, 1320a–7a, or 1395cc(b)(2) of this title.

This provision confirms that states may and do set standards that relate to providers' ability to practice in a professionally competent manner. Take the cross-references to start. They identify various forms of misconduct including patient abuse, failure to furnish medically necessary services, fraud, license revocation, excessive charges, and failure to disclose necessary information to state regulators. 42 U.S.C. § 1320a–7. In short, federal regulations confirm the authority vested in states to "set[] reasonable standards relating to the qualifications of providers" on analogous state-law grounds. *See* 42 C.F.R. § 431.51(c)(2).

Putting all this together, § 1396a(p)(1) and the free-choice-of-provider provision operate in pleasant conjunction. The free-choice-of-provider provision confers an

30

individual right on Medicaid recipients to select the willing and competent provider of their choice. Section 1396a(p)(1) clarifies that states retain discretionary authority to disqualify providers as professionally incompetent for nonmedical reasons such as fraud and for any number of unprofessional behaviors. But the emphasis in § 1396a(p)(1) upon professional malfeasance in no way deprives states of the latitude they possess, under the free-choice-of-provider provision itself, to judge a provider's medical qualifications. Indeed, the language that begins the free-choice-of-provider provision—"A State plan for medical assistance must— provide," 42 U.S.C. § 1396a(a)(23)(A)—presupposes the existence of discretionary authority in the states as it relates to provider qualifications. Nevertheless, the fact that the statute's language and structure suggest the deference due states on the matter of professional and medical qualifications in no way confers a blank check. Here, it bears repeating, no one disputes PPSAT's medical qualifications to perform the family-planning services required, nor is any professional wrongdoing on the part of PPSAT even alleged. So it follows that South Carolina cannot arbitrarily disqualify PPSAT upon the generalized assertion of inapposite state interests without running afoul of the free-choice-of-provider provision.

South Carolina attempts to disrupt the congruence between these two provisions by reading the savings clause "for more than it's worth." *Planned Parenthood of Ind.*, 699 F.3d at 979. The state argues that the phrase "[i]n addition to any other authority" in § 1396a(p)(1) means it can exclude a provider on any state-law grounds—and for any reason. *See* Appellant's Opening Brief at 32 ("South Carolina's authority, under Section 1396a(p)(1), to determine whether a provider is qualified does not depend on the state

31

interest the disqualification seeks to protect.").

The district court rejected this interpretation, concluding that reading the savings clause this way would render the right conferred by the free-choice-of-provider provision meaningless. *Baker*, 326 F. Supp. 3d at 47-48. We agree. If Congress had in fact harbored the sweeping intent that South Carolina gleans from § 1396a(p)(1), there would be no reason to bother with the free-choice-of-provider provision, as any state-law ground could serve as the basis to eliminate a patient's choice. To say that this would warp the law enacted by Congress is an understatement.

Moreover, South Carolina's interpretation also finds no support in the four corners of § 1396a(p)(1). For one thing, the phrase "[i]n addition to any other authority" serves a specific purpose. It lists what "is a non-exclusive list of specific grounds upon which states may bar providers from participating in Medicaid." *Planned Parenthood of Ind.*, 699 F.3d at 979. The grounds identified—spanning everything from financial fraud to medical malpractice—relate generally to professional malfeasance. In contrast, the type of "qualification" the state argues for under § 1396a(p)(1) is different in kind. South Carolina's exclusion of PPSAT from its Medicaid network has nothing to do with professional misconduct or for that matter with PPSAT's ability to safely and professionally perform plaintiff's required family-planning services. PPSAT, after all, continues to deliver these services to thousands of South Carolinians each year—to which the state has no objection. *See* J.A. 91.

What we are left with, ironically, is the state's attempt to eliminate almost the entirety of § 1396a(p)(1). For if the phrase "[i]n addition to any other authority" authorizes

32

any and all state interests to serve as a basis for termination, there would be no need to list the specific grounds identified in § 1396a(p)(1). Congress sometimes employs the broad version of the phrase. *See, e.g.*, 7 U.S.C. § 2279(c)(4)(B) ("The authority to carry out this section shall be *in addition to any other authority* provided in this or any other Act.") (emphasis added). But it did not do so here, and the foregoing discussion makes clear that this was not through inadvertence.

Consider also the cases cited by the state to support its broad reading of the savings clause. In *Guzman v. Shewry*, 552 F.3d 941 (9th Cir. 2009), the Ninth Circuit did not hold that § 1396a(p)(1) grants states plenary exclusion authority over healthcare providers. Rather, that court expressly recognized that states may exclude providers "for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity." *Id.* at 949 (citing 42 U.S.C. § 1320a-7(b)(5)). In any event, the provider in *Guzman* was deemed "unqualified" based on a state law guarding against professional malfeasance—as were the providers in all cases interpreting § 1396a(p)(1) that South Carolina cites. *See id.* at 946-47 (fraud or abuse); *First Med. Health Plan v. Vega-Ramos*, 479 F.3d 46, 49-50 (1st Cir. 2007) (financial self-dealing); *Triant v. Perales*, 491 N.Y.S.2d 486, 488 (App. Div. 1985) (shoddy record-keeping).

In the end, to read § 1396a(p)(1) as imposing such severe limits on the scope of the right conferred by the free-choice-of-provider provision would eviscerate the Medicaid Act's cooperative scheme and turn the congressional judgment on its head. Congress, aware of the deep national divide on a topic so sensitive as abortion, sought to strike a balance in the Medicaid Act. Starting in 1976, Congress has prohibited federal funds from

33

being used to finance abortions, excepting instances of rape, incest, or to save the life of the mother. *Harris v. McRae*, 448 U.S. 297, 302 (1980) (describing the Hyde Amendment). On the other hand, Congress provided extra protections for beneficiaries' freedom of choice among family-planning providers, something it accomplished while amending the free-choice-of-provider provision to accommodate Medicaid managed care plans.[5] The Secretary, to wit, may waive the free-choice-of-provider provision when a state implements a Medicaid managed care plan. But with an important caveat: An individual's right to seek out non-abortion services from a qualified family-planning provider of her choice cannot be waived. 42 U.S.C. §§ 1396a(a)(23)(B), 1396d(a)(4)(C); *see also Betlach*, 727 F.3d at 972 ("Even if a state otherwise exercises its option to implement a managed-care system, § 1396a(a)(23)(B) makes clear that as to family planning services, state Medicaid plans must afford recipients the full range of free choice of provider."). This implicit bargain agreed to by the political branches is one that we are bound to respect.

## VII.

Because the individual plaintiff has a private right of action to challenge South Carolina's denial of her right to the qualified and willing family-planning provider of her choice, we agree with the district court that she has demonstrated a substantial likelihood of success on her free-choice-of-provider claim. We also hold that the district court did not

---

[5] Medicaid managed care plans allow a state to contract with a limited selection of healthcare providers. Through this arrangement, states can lower their Medicaid expenses and streamline their delivery of health care. There is no contention that any waiver of the free-choice-of-provider provision took place here.

abuse its discretion in enjoining South Carolina from terminating PPSAT's provider agreement.

It is clear that the plaintiff would suffer irreparable harm in the absence of a preliminary injunction. Denial of her statutory right to select a qualified provider visits a tangible harm: diminished access to high-quality health care suited to the individual plaintiff's needs. *See* Appellees' Brief at 39. That PPSAT may be one of many providers available to the individual plaintiff through South Carolina's Medicaid network is not dispositive; the free-choice-of-provider provision, as we have noted, guarantees a patient's access to her *preferred* provider, save on matters of professional integrity and competency. South Carolina has a legitimate interest in ensuring that state dollars do not subsidize abortion. But we are not prepared to disrupt the district court's finding that the state's reimbursement of PPSAT on a fee-for-service basis guards against the indirect subsidization of abortion. Finally, an injunction would serve the public interest by preserving the individual plaintiff's statutory right under the free-choice-of-provider provision and ensuring "affordable access to competent health care by some of South Carolina's neediest citizens," *Baker*, 326 F. Supp. 3d at 50, whose health challenges are every bit as real as those of citizens of greater means.

We do not doubt that South Carolina's termination of PPSAT's provider agreement was intended "to further [its] own legitimate interests in protecting prenatal life." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 853 (1992). Reasonable people can disagree with how Congress chose to balance state flexibility on the one hand, and enforcement of federal entitlements on the other. But in all events federal courts are ill-suited to second-

35

guess this act of political judgment in the Medicaid Act. An injury so concrete and a right so clear is something that the courts must respect, else we forsake natural and straightforward readings of statutory text in favor of spinning ever-finer webs of circumvention that lead to our desired outcomes. To subscribe to this portentous course is to abandon the very source of our authority and the mandate that alone makes the Third Branch a distinctive organ of our government. The judgment of the district court is affirmed.

AFFIRMED

RICHARDSON, Circuit Judge, concurring:

I join in affirming the grant of the preliminary injunction. The Majority correctly recognizes that applying existing Supreme Court precedents requires that we find § 1396a(a)(23) to unambiguously create a right privately enforceable under § 1983 to challenge a State's determination of whether a Medicaid provider is "qualified." Six Circuits now recognize that § 1396a(a)(23) creates this enforceable right.[1] One Circuit does not.[2]

As lower court judges, we are bound to do our level best to apply the law as it is, not how it may become. We have done so here. But when binding precedents present us with a bit of "a mess of the issue," *Gee v. Planned Parenthood of Gulf Coast, Inc.*, 139 S. Ct. 408, 409 (2018) (Thomas, J., dissenting from denial of certiorari), our job becomes particularly challenging.

---

[1] *See Planned Parenthood S. Atlantic & Julie Edwards v. Baker*, No. 18-2133 (4th Cir. 2019); *Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 638 (2018); *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017), *cert. denied*, 139 S. Ct. 408 (2018); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013), *cert. denied*, 571 U.S. 1198 (2014); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 569 U.S. 1004 (2013); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006).

[2] *See Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017). And in the last two years, other judges have raised questions about recognizing the right of action. *See Planned Parenthood of Greater Tex. Family Planning and Preventive Health Servs., Inc. v. Smith*, 913 F.3d 551, 569–73 (5th Cir. 2019) (Jones, J., concurring); *Gee*, 862 F.3d at 473–86 (Owen, J., dissenting); *Andersen*, 882 F.3d at 1238–49 (Bacharach, J., concurring in part and dissenting in part).

The challenge here derives from a broader question lurking in the background. What is the proper framework for determining whether a given statute creates a right that is privately enforceable under § 1983? And specifically, has *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990), a case relied on in other Circuits' decisions and in our own, been repudiated (or even effectively overruled)? There are indications that it has. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1386 n.* (2015). But we do not lightly conclude that the Supreme Court has overruled its prior cases—that job is for the Supreme Court alone. *See Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

Like this case, *Wilder* involved a question of whether a subsection of § 1396a(a) of the Medicaid Act created a private right of action under § 1983. The particular provision at issue required a State's plan for medical assistance to "provide . . . for payment" of certain medical services "through the use of rates (determined in accordance with methods and standards developed by the State . . .) *which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities. . . .*" 496 U.S. at 502–03 (quoting 42 U.S.C. § 1396a(a)(13)(A)) (alterations and emphasis in original).[3]

---

[3] In 1997, Congress replaced the provision at issue in *Wilder*. *See Long Term Care Pharmacy All. v. Ferguson*, 362 F.3d 50, 58 (1st Cir. 2004).

38

The *Wilder* Court found that service providers had an enforceable right under § 1983 to reimbursement at "reasonable and adequate" rates. 496 U.S. at 512. It reached this conclusion after looking to three "factors." First, the Court had "little doubt that health care providers are the intended beneficiaries" of the provision. *Id.* at 510. Then the Court observed that the statutory language imposed a binding obligation on States that participate in the Medicaid program because the relevant statutory provision was "cast in mandatory rather than precatory terms," given its use of the word "*must*." *Id.* Finally, the Court found that the provision's obligation was not "too 'vague and amorphous' to be judicially enforceable," applying what would become the second of the three "factors" to find clarity in the statutory directive for payment of "rates . . . which the State finds . . . are reasonable and adequate." *Id.* at 503; *see id.* at 519.[4]

Seven years later in *Blessing*, the Supreme Court instructed courts to apply these "three principal factors" to determine whether a statutory provision creates an enforceable right under § 1983. *Blessing v. Freestone*, 520 U.S. 329, 338 (1997). The Court applied

---

[4] In finding that this statutory right was "judicially enforceable," the Court rejected the argument that the language in the Medicaid Act giving States the authority to set rates "which the State finds . . . reasonable and adequate," granted "a State flexibility to adopt *any* rates it finds are reasonable and adequate." *Wilder*, 496 U.S. at 503, 519 (emphasis added). Though acknowledging that the Act provided States "substantial discretion in choosing among reasonable methods of calculating rates," the Court held that it was "well within the competence of the Judiciary" to identify which rates were "outside that range that no State could ever find to be reasonable and adequate." *Id.* at 519–20.

In this way, *Wilder* seems to foreclose the argument that § 1396a(a)(23) grants South Carolina the flexibility to adopt qualifications based on its interests beyond professional integrity and competency. *See* Majority Op. at 17, 27–29. And on this record, South Carolina has not explained how its actions fall within its broad discretion to identify professional qualifications.

the multifactor test from *Wilder* to determine whether § 1983 established a private right of action under Title IV–D of the Social Security Act. *See Blessing*, 520 U.S. at 338, 340–41.

When the Supreme Court again revisited privately enforcing a statutory right under § 1983 in *Gonzaga*, it seemed to consider this multifactor test problematic, to say the least. "[C]onfusion" on how to apply the *Blessing* factors improperly "led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002); *see id.* (noting the "uncertainty"). *Gonzaga* also questioned "how relations between the branches are served by having courts apply a *multifactor balancing test* to pick and choose which federal requirements may be enforced by § 1983 and which may not." *Id.* at 286 (emphasis added).

The multifactor test is not the only aspect of *Wilder* that has been questioned. *Wilder* had noted that its analysis was "a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute." 496 U.S. at 508 n.9. On this point, the Court in *Gonzaga* would later "reject the notion" that "*Wilder* appears to support" that "our implied private right of action cases have no bearing on the standards for discerning whether a statute creates rights enforceable by § 1983." 536 U.S. at 283. To the contrary, "our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983." *Id.*

So are *Wilder*, specifically, and the *Blessing* factors, generally, still good law? On the one hand, we look to the three factors from *Blessing*. 520 U.S. at 338, 340–41. But on

40

the other hand, we must find a bright-line:  nothing "short of an unambiguously conferred right."  *Gonzaga*, 536 U.S. at 283.

But *Gonzaga* did not explicitly overrule *Blessing*'s three-factor approach.  Nor did it plainly discard *Wilder*'s application of the factors.  *See Gonzaga*, 536 U.S. at 289–90 (distinguishing *Wilder* on its facts).  More recently, the Court has more directly questioned *Wilder*'s reasoning and validity.  *Armstrong*, 135 S. Ct. at 1386 n.* ("Respondents do not claim that *Wilder* establishes precedent for a private cause of action in this case.  They do not assert a § 1983 action, since our later opinions *plainly repudiate* the ready implication of a § 1983 action that *Wilder* exemplified." (emphasis added)).  Yet, at least in our Circuit, *Wilder* and *Blessing* remain controlling.  *See, e.g.*, *Doe v. Kidd*, 501 F.3d 348, 356 (4th Cir. 2007) (relying on *Wilder* and *Blessing* to find § 1396a(a)(8) confers an individual right).

Despite the "confusion" and "uncertainty," we must apply the law as we find it.  Today, our opinion is "guide[d]" by the three factors from *Blessing*.  Majority Op. at 14.  Following their guide requires that we find a private right of action under § 1983 to challenge a State's determination of whether a Medicaid provider is "qualified" under 42 U.S.C. § 1396a(a)(23).  And so I do.  But I do so with hope that clarity will be provided.