**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-4067**

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

   v.

LENAIR MOSES, a/k/a Bones,

          Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:19-cr-00339-FL-1)

Argued: October 29, 2021                      Decided: January 19, 2022

Before NIEMEYER and KING, Circuit Judges, and Thomas T. CULLEN, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Cullen joined. Judge King wrote a separate opinion dissenting in part and concurring in the judgment.

**ARGUED:** Marshall Hood Ellis, HORNTHAL, RILEY, ELLIS & MALAND, LLP, Elizabeth City, North Carolina, for Appellant. David A. Bragdon, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** G. Norman Acker, III, Acting United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

In this appeal, we determine the enforceability of and the weight to be given the official commentary of the Sentencing Guidelines. And to make that determination, we must consider whether we are required to continue to apply the rules set forth in *Stinson v. United States*, 508 U.S. 36 (1993), which held that Guidelines commentary, *even when the related Guideline is unambiguous*, is authoritative and therefore *binding* on courts unless the commentary is inconsistent with law or the Guideline itself, *id.* at 38, 43, 44, or whether *Stinson* was overruled by the Supreme Court's recent decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), which limited controlling deference to an executive agency's reasonable interpretation of its own regulations to where "the regulation is *genuinely ambiguous*," *id.* at 2415 (emphasis added). Thus, under *Stinson*, Guidelines commentary would be authoritative and binding regardless of whether the Guideline to which it is attached is ambiguous, whereas under *Kisor*, Guidelines commentary would receive such deference only if the Guideline is "genuinely ambiguous." The distinction is meaningful to federal courts' continued reliance on Guidelines commentary when sentencing criminal defendants.

In the case before us, after Lenair Moses was convicted of two counts of drug trafficking, the district court sentenced him as a career offender under U.S.S.G. § 4B1.1, based on two prior drug-trafficking convictions. Moses argues, however, that the conduct involved in one of the prior convictions that was counted as a predicate was actually part of the same course of conduct as his current offenses and therefore should have been

considered "relevant conduct" under § 1B1.3, rather than as part of his criminal history, thereby resulting in a substantially lower Guidelines sentencing range.

Application Note 5(C) to § 1B1.3, however, defines the line between a defendant's conduct involved in a prior conviction and his relevant conduct, stating that "conduct *associated with a sentence that was imposed prior to*" the conduct of the instant offense "is not considered" to be relevant conduct. (Emphasis added). Therefore, if Application Note 5(C) is authoritative and binding, the conduct associated with Moses's prior offense — an offense for which he was convicted and sentenced years before he committed the instant offenses — was properly found not to be conduct relevant to his current offenses. Moses argues, however, that *Kisor* controls whether Application Note 5(C) is binding and that when *Kisor*'s limitations on deference are applied, "Application Note 5(C) is not entitled to controlling weight." Accordingly, he contends that the district court erred in relying on Application Note 5(C) to sentence him as a career offender.

Upon consideration of the unique role served by the Sentencing Commission and its Guidelines Manual and a careful reading of both *Stinson* and *Kisor*, we conclude that *Kisor* did not overrule *Stinson*'s standard for the deference owed to Guidelines commentary but instead applies in the context of an executive agency's interpretation of its own legislative rules. While we recognize that our conclusion is not shared by at least two circuits — *see United States v. Nasir*, 17 F.4th 459, 469–72 (3d Cir. 2021) (en banc); *United States v. Riccardi*, 989 F.3d 476, 484–86 (6th Cir. 2021) — we believe that subjecting Guidelines commentary to the *Kisor* framework would deny courts the benefit of much of the Guidelines commentary that both Congress and the Sentencing Commission

3

intended courts to apply when sentencing defendants. Indeed, the Guidelines themselves state that *the failure to follow commentary* could result in "an incorrect application of the guidelines" and subject sentences to "possible reversal on appeal." U.S.S.G. § 1B1.7. Because we conclude that *Stinson* continues to apply unaltered by *Kisor* and that Application Note 5(C) must be afforded binding effect under *Stinson*, we also conclude that the district court did not err in applying the career-offender enhancement when calculating Moses's advisory Guidelines range. In addition, we reject Moses's alternative argument that the district court's downward variance sentence of 120 months' imprisonment was substantively unreasonable. Accordingly, we affirm the judgment of the district court.

I

In October 2018, Lenair Moses sold $20 worth of crack cocaine to a confidential informant in an "open air drug market" in Raleigh, North Carolina. Six days later, he again sold $20 worth of crack cocaine to a confidential informant in the College Park area of Raleigh. The total quantity of crack cocaine sold by Moses in these transactions was 0.49 grams. Moses pleaded guilty to two counts charging him with the distribution of a quantity of cocaine base, in violation of 21 U.S.C. § 841(a)(1).

In the presentence report prepared for Moses's sentencing, the probation officer determined that, based on the quantity of drugs distributed, Moses's base offense level was 12. But concluding that Moses qualified as a career offender under U.S.S.G. § 4B1.1(a), the probation officer increased his offense level from 12 to 32. The two predicate

convictions identified for finding Moses to be a career offender were (1) a 2009 North Carolina felony conviction for possession with intent to sell or deliver cocaine and (2) a 2013 North Carolina felony conviction for the same offense. After reducing Moses's offense level by 3 levels for his acceptance of responsibility, the probation officer reached a total offense level of 29. He also determined that Moses had a criminal history score of 23 based on his long record of prior convictions, which included two juvenile adjudications for making terroristic threats; a felony firearm conviction; a felony conviction for engaging in a robbery conspiracy; a misdemeanor conviction for assault by pointing a gun; two other misdemeanor convictions for simple assault; a felony conviction for conspiracy to commit robbery with a dangerous weapon; and a felony conviction for interfering with an electronic monitoring device. Moses's criminal history score of 23 far exceeded the 13 criminal history points necessary for Criminal History Category VI, the maximum under the Guidelines. The combination of an offense level of 29 and Criminal History Category VI resulted in an advisory sentencing range of 151 to 188 months' imprisonment. Had Moses's offense level not been enhanced by his career-offender status, however, the resulting sentencing range would have been 21 to 27 months' imprisonment.

Moses objected to the career-offender designation, arguing that his 2013 North Carolina felony conviction for possession with intent to sell or deliver cocaine should not have been counted as a predicate conviction for purposes of the career-offender enhancement but rather that the conduct associated with that prior conviction should have been taken as "relevant conduct" to the instant offenses under U.S.S.G. § 1B1.3, resulting in a much lower sentencing range. He pointed to § 4B1.2(c), § 4A1.1, and § 4A1.2(a)(1),

5

arguing that those provisions, taken together, require a prior predicate conviction to have been "*for conduct not part of the instant offense.*" U.S.S.G. § 4A1.2(a)(1) (emphasis added). But, he argued, the conduct associated with his 2013 drug-trafficking conviction did indeed constitute "part of the instant offense" because it qualified as "relevant conduct" under § 1B1.3, which provides that, for certain types of offenses (including drug offenses), relevant conduct includes conduct that was "part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2); *see also id.* § 4A1.2 cmt. n.1 (stating that "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3"). In short, according to Moses, "the conduct underlying the 2013 incident [was] 'part of the instant offense,' and the sentence imposed for that conduct . . . is not a 'prior sentence'" that can be "relied upon to enhance [his] sentence [as a career offender] under § 4B1.1."

Alternatively, Moses objected to the sentence proposed in the presentence report on the ground that it was substantively unreasonable, and he requested a "substantial downward variance." He pointed to potential irregularities with his 2009 felony drug conviction and argued that "no one should have to spend 12+ years in prison for selling *less than 1/2 gram* of a controlled substance."

The government argued that the probation officer had properly counted Moses's 2013 conviction as a predicate conviction for career-offender status because Moses had been *convicted and sentenced* for the 2013 conduct well before he committed the instant offenses and had indeed been incarcerated from August 2014 through March 2018. It was not until October 2018, seven months after his release, that he sold the cocaine involved in

6

the instant convictions. Based on this, the government argued that Moses's time in prison "between the 2013 offense and the instant conduct in this case" meant that there was not a "sufficient connection" for the two to be considered as part of the same course of conduct or a common scheme or plan. For support, it relied on Application Note 5(C) to § 1B1.3, which states that "offense conduct associated with *a sentence that was imposed prior to the acts or omissions* constituting the instant federal offense (the offense of conviction) is not considered as part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3 cmt. n.5(C) (emphasis added).

The government also opposed Moses's request for a downward variance, noting that Moses had continued to commit crimes "despite serving at least two lengthy prison sentences" in state custody. It argued that Moses had shown "no remorse for his actions" and that "only a significant criminal sentence will prevent him from committing crimes in the future."

At sentencing, the district court confirmed with Moses's counsel that his position was that the court "should disregard [Application] Note 5(C)." But the court then rejected that argument and concluded that the 2013 conviction qualified as a prior predicate conviction, rather than as relevant conduct. While the court thus overruled Moses's objection to his career-offender status, it nonetheless imposed a downward variant sentence of 120 months' imprisonment, stating that "[s]ome of the defendant's arguments resonate . . . as to why a variance should be imposed," including the "amount of the drug" involved in the instant offenses.

7

From the district court's judgment dated February 9, 2021, Moses filed this appeal, challenging both the court's reliance on Application Note 5(C) to § 1B1.3 in concluding that the career-offender enhancement was applicable and the substantive reasonableness of a 120-month sentence for distributing one-half a gram of crack cocaine.

II

Moses contends that while the district court concluded that his 2013 drug-trafficking conviction was one of two predicate convictions that qualified him as a career offender, that conviction was actually based on conduct relevant to his current drug-trafficking convictions. Defining the line between conduct constituting a prior conviction and conduct relevant to the current offense, Application Note 5(C) to U.S.S.G. § 1B1.3 states that "offense conduct associated *with a sentence that was imposed prior to the acts or omissions constituting the instant federal offense* (the offense of conviction) is not considered as" relevant conduct. (Emphasis added). If Application Note 5(C) were binding, then Moses's argument that he does not qualify as a career offender would have to be rejected, as both parties acknowledge.

But Moses urges us to conclude that the district court erred in applying Application Note 5(C), relying on the Supreme Court's recent decision in *Kisor*, which, he argues, "chang[ed] the analysis that *Stinson* once gave us with respect to Guidelines commentary." He argues that under the *Kisor* deference standard, Application Note 5(C) cannot be considered as authoritative and that, as a result, his sentence must be vacated and his case

8

remanded to enable the district court to determine, without applying Application Note 5(C), whether his 2013 conduct qualifies as relevant conduct under § 1B1.3(a)(2).

*Stinson*, which was decided before *Kisor*, directly addressed the enforceability of and weight to be given Guidelines commentary, such as Application Note 5(C), recognizing that "commentary explains the guidelines and provides concrete guidance as to how even *unambiguous* guidelines are to be applied" in sentencing criminal defendants. *Stinson*, 508 U.S. at 44 (emphasis added). It further observed that the commentary provides "the most accurate indication[] of how the [Sentencing] Commission deems that the guidelines should be applied," *id*. at 45, and it held accordingly that, subject to some exceptions, the commentary is "authoritative," "binding," and "controlling," *id*. at 38, 42–43, 45–47.

*Kisor*, on the other hand, addressed whether the Court should overrule *Auer v. Robbins*, 519 U.S. 452 (1997), which had broadly authorized judicial deference to an agency's interpretation of its own rules. Conducting its analysis against a backdrop of concerns that executive agencies were using such rule interpretations to circumvent the notice-and-comment procedures required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, the *Kisor* Court nonetheless declined to overrule *Auer*. *See* 139 S. Ct. at 2408. The Court did, however, "cabin[] *Auer*'s scope" with respect to the deference owed to an agency's interpretation of its own rules. *Id*. at 2418. Specifically, the Court held that a "court should not afford *Auer* deference unless the regulation is *genuinely ambiguous*," *id*. at 2415 (emphasis added), and that even if a genuine ambiguity were found, the agency's interpretation still "must come within the zone of ambiguity," *id*. at 2415–16.

9

Moses now contends that *Kisor* changed the analysis that *Stinson* previously provided with respect to the enforceability and weight of Guidelines commentary. And when *Kisor* is applied here, he maintains, Application Note 5(C) is not owed controlling deference.

After considering the distinct contexts and actual holdings of *Stinson* and *Kisor*, we conclude that even though the two cases addressed analogous circumstances, *Stinson* nonetheless continues to apply when courts are addressing Guidelines commentary, while *Kisor* applies when courts are addressing executive agency interpretations of legislative rules.

We begin with the recognition that Congress enacted the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*, and 28 U.S.C. §§ 991–998, to replace "a system of indeterminate sentencing" with one that made "all sentences basically determinate." *Mistretta v. United States*, 488 U.S. 361, 363, 367 (1989). To this end, Congress created the United States Sentencing Commission "and charged it with the task of 'establish[ing] sentencing policies and practices for the Federal criminal justice system.'" *Stinson*, 508 U.S. at 40–41 (quoting 28 U.S.C. § 991(b)(1)). The Commission was "established as an independent commission *in the judicial branch* of the United States," with seven voting members, at least three of whom must be federal judges, appointed by the President with the advice and consent of the Senate, 28 U.S.C. § 991(a) (emphasis added), making it "unquestionably . . . a peculiar institution within the framework of our Government," *Mistretta*, 488 U.S. at 384. Congress charged the Commission with the task of promulgating guidelines "for use of a sentencing court in determining the sentence to be

10

imposed in a criminal case," 28 U.S.C. § 994(a)(1), and directed that the Commission's guidelines "establish a sentencing range" "for each category of offense involving each category of defendant," *id.* at § 994(b)(1). Congress also charged the Commission with additional tasks, including, among others: (1) to "establish sentencing policies and practices" that "provide certainty and fairness . . . [and] avoid[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct," *id.* § 991(b)(1)(B); (2) to "promulgate and distribute to all courts of the United States . . . general policy statements regarding application of the guidelines," *id.* § 994(a)(2); and (3) to "issue instructions to probation officers concerning the application of Commission guidelines and policy statements," *id.* § 995(a)(10).

To fulfill the tasks assigned to it by Congress, the Sentencing Commission promulgated and published the "United States Sentencing Commission Guidelines Manual," the first version of which went into effect on November 1, 1987. The Guidelines Manual includes Guidelines, policy statements, and official commentary, all of which are interrelated and serve specific functions in fulfilling the Commission's designated tasks. Before the first Guidelines Manual went into effect, a proposed version of it was published in the Federal Register for public comment and submitted to Congress for review. *See* Notice of Sentencing Guidelines and Policy Statements for the United States Courts as submitted to Congress, together with Certain Technical, Conforming, and Clarifying Amendments, 52 Fed. Reg. 18,046 (May 13, 1987); *see also* 28 U.S.C. § 994(x) (requiring the Commission to comply with the notice-and-comment procedures of 5 U.S.C. § 553 with respect to "the promulgation of guidelines"); *id.* § 994(p) (requiring the Commission

11

to submit "amendments to the guidelines" to Congress).  While the Commission has taken the position that it can promulgate and amend policy statements and official commentary, as distinct from Guidelines, without using this notice-and-comment and congressional-submission procedure, it nonetheless follows the practice of providing, "to the extent practicable, comparable opportunities for public input on proposed policy statements and commentary considered in conjunction with guideline amendments," and it also "endeavor[s] to include amendments to policy statements and commentary in any submission of guideline amendments to Congress."  United States Sentencing Commission, Rules of Practice and Procedure 6–7 (as amended Aug. 18, 2016).  Thus, the Commission, in practice, generally follows the same process for adopting and amending policy statements and commentary as it uses for the promulgation and amendment of the Guidelines themselves.

Of particular relevance here, one of the Commission's original Guidelines — the text of which remains unchanged from when it was first published and submitted to Congress for review, *see* 52 Fed. Reg. at 18,110 — addresses the "Significance of Commentary," providing that "[t]he Commentary that accompanies the guideline sections may serve" three functions:

> First, it may *interpret the guideline or explain how it is to be applied*.  Failure to follow such commentary could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal.  Second, the commentary may *suggest circumstances which, in the view of the Commission, may warrant departure from the guidelines.  Such commentary is to be treated as the legal equivalent of a policy statement*.  Finally, the commentary may provide background information, including factors considered in promulgating the guideline or reasons underlying promulgation of the guideline.  *As with a policy statement, such commentary*

12

> *may provide guidance in assessing the reasonableness of any departure from the guidelines.*

U.S.S.G. § 1B1.7 (emphasis added) (citation omitted).

Following the promulgation of the first Guidelines Manual and as district judges around the country began sentencing criminal defendants under the new scheme, questions arose about the legal force of both the policy statements and the official commentary. In response, the Supreme Court held in *Williams v. United States*, 503 U.S. 193 (1992), that "[w]here . . . a policy statement prohibits a district court from taking a specified action, *the statement is an authoritative guide to the meaning of the applicable Guideline*," such that "[a]n error in interpreting such a policy statement could lead to . . . an incorrect application of the sentencing guidelines." *Id.* at 201 (emphasis added) (cleaned up). And about a year later, the Court in *Stinson* held that its "holding in *Williams* dealing with policy statements *applies with equal force to the commentary before us here.*" 508 U.S. at 43 (emphasis added). The Court gave several reasons for reaching that conclusion. It noted that "[a]lthough the Sentencing Reform Act [did] not in express terms authorize the issuance of commentary," that Act had been amended subsequent to the promulgation of the first Guidelines Manual to "refer to it." *Id.* at 41 (citing 18 U.S.C. § 3553(b)(1) (providing that "[i]n determining whether a circumstance was adequately taken into consideration [so as to preclude a departure], the court shall consider only the sentencing guidelines, policy statements, *and official commentary of the Sentencing Commission*" (emphasis added))). The Court also emphasized that § 1B1.7 provides for the use of commentary and delineates the distinct "functions" that "commentary may serve," *id.*, which includes "explain[ing]

13

the guidelines and provid[ing] concrete guidance as to how even unambiguous guidelines are to be applied in practice," *id.* at 44. Moreover, the Court recognized that "[a]ccording [a] measure of controlling authority to the commentary is consistent with the role the Sentencing Reform Act contemplates for the Sentencing Commission." *Id.* at 45.

In sum, the Sentencing Commission, as a unique government institution located in the Third Branch, promulgated the Guidelines Manual to guide and cabin the sentencing discretion of individual district judges. And to address the multifarious circumstances that can be relevant to each individual defendant and statutory sentencing objectives, *see* 28 U.S.C. § 994(a)(1), (2); § 994(c); and § 994(d), the Guidelines Manual is structured with interrelated layers of explanation consisting of Guidelines, policy statements, and official commentary. In this context, therefore, the policy statements and commentary are especially meaningful in understanding the Guidelines, regardless of whether any Guideline is ambiguous. The only limitation to the binding effect of commentary occurs, as the Supreme Court held, when the commentary "violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, [the] guideline." *Stinson*, 508 U.S. at 38. And it defined "inconsistent" strictly such that it is generally understood to mean that "following one will result in violating the dictates of the other." *Id.* at 43; *see also United States v. Allen*, 909 F.3d 671, 674 (4th Cir. 2018).

Over the years, district judges have routinely consulted commentary to understand and apply the Guidelines, and they never felt themselves restrained in doing so by any notion that commentary was binding only when the Guideline was ambiguous or when the commentary purported to resolve a textual ambiguity. Indeed, *Stinson* explicitly

14

recognized that commentary can be useful even when a Guideline is "unambiguous." 508 U.S. at 44. And the *Stinson* Court's deference to the particular commentary at issue did not depend on a determination that it was a reasonable interpretation of a genuine ambiguity. In *Stinson*, the Guideline at issue was one that defined the term "crime of violence" as including any felony that "involves conduct that presents a serious potential risk of physical injury to another." *Id.* at 38 (quoting U.S.S.G. § 4B1.2(1) (Nov. 1992)). That term, however, was explained in an application note "not [to] include the offense of unlawful possession of a firearm by a felon." *Id.* at 39 (quoting § 4B1.2 cmt. n.2). In upholding "the commentary [as] a binding interpretation of the phrase 'crime of violence,'" the Court "recognize[d] that the exclusion of the felon-in-possession offense from the definition of 'crime of violence' may not be compelled by the guideline text." *Id.* at 47. But because the application note did "not run afoul of the Constitution or a federal statute, and it [was] not plainly erroneous or inconsistent with" the Guideline, it was binding on the federal courts in their calculation of defendants' sentencing ranges. *Id.* (cleaned up).

Unlike the formally published Guidelines Manual that includes not only Guidelines and policy statements but also official commentary, all three of which were, in practice, generally promulgated by the notice-and-comment and congressional-submission procedure and which operate together as a reticulated whole, executive agency interpretations have been made more casually and broadly through, for example, the issuance of letters, opinions, press releases, and legal briefs without the notice-and-comment procedures of rulemaking. In addition, while both the Sentencing Commission and an executive agency are in a broad sense agencies, their purposes and roles are quite

15

distinct.  The Sentencing Commission is judicial in nature, and its Guidelines Manual, including its policy statements and commentary, is directed at providing guidance to district judges tasked with the duty of imposing an individualized sentence on a criminal defendant.  *See United States v. Booker*, 543 U.S. 220, 245 (2005).  In contrast, the role of other federal agencies is typically executive.  Their interpretations seek not just to inform and guide but also to regulate the broad range of people covered by the particular agency's jurisdiction, and they do so without the express authorization of Congress.  These differences justify a distinct approach in considering Guidelines commentary, on the one hand, and an agency's interpretation of its legislative rules, on the other.  And treating the two differently is entirely consistent with *Kisor*.

In *Kisor*, the issue presented to the Court was whether it should overrule its prior decisions in *Auer* and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945), both of which provided that agencies' interpretations of their own rules should be given controlling deference, even though the interpretations did not go through the notice-and-comment procedure that the APA requires for the promulgation of rules.  It was perceived by some that "*Auer* . . . [had] obliterate[d] a distinction Congress thought vital and supplie[d] agencies with a shortcut around the APA's required procedures for issuing and amending substantive rules that bind the public with the full force and effect of law." *Kisor*, 139 S. Ct. at 2434 (Gorsuch, J., concurring in the judgment).  Nonetheless, the *Kisor* Court declined to overrule *Seminole Rock* and *Auer*.  But it did, understandably, impose substantial restrictions on courts' reliance on agencies' interpretations of their rules.

16

*First*, the Court held that "a court should not afford *Auer* deference *unless* the regulation is *genuinely ambiguous*" and that, "before concluding that a rule is genuinely ambiguous, a court must exhaust all the traditional tools of construction" by "carefully consider[ing] the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Kisor*, 139 S. Ct. at 2415 (emphasis added) (cleaned up). *Second*, it held that even where the regulation is found to be genuinely ambiguous, "the agency's reading must still be reasonable," meaning that "it must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415–16 (cleaned up). And *third*, it held that even if the agency has reasonably read a genuinely ambiguous rule, a court still "must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 2416.

It readily appears that *Kisor*, considered on its own terms, does not apply to the Sentencing Commission's official commentary in the Guidelines Manual. While the Court explicitly cabined the scope of deference afforded by *Seminole Rock* and *Auer*, there is scant suggestion in *Kisor* that the Court thought that those cases *applied* to the enforceability of and weight to be given to Guidelines commentary.[*] Nor did *Stinson* itself so indicate. To be sure, the *Stinson* Court did look at the *Seminole Rock* line of cases as

---

[*] We recognize that a footnote in the *Kisor* plurality opinion did include a citation to *Stinson* as part of a string cite of 16 cases supporting the proposition that the Court's "pre-*Auer*[] decisions applying *Seminole Rock* deference are legion." 139 S. Ct. at 2411 n.3 (plurality opinion). But close consideration of *Stinson* shows, as discussed herein, that while the Court drew from *Seminole Rock*, *it did not conclude that the doctrine applied* to the official commentary of the Guidelines.

17

providing a helpful "analogy" when it "articulate[d] the standard that governs the decision whether particular interpretive or explanatory commentary is binding." 508 U.S. at 43–45. Yet, even while looking to those cases in fashioning its standard, the *Stinson* Court acknowledged that "the analogy is not precise," *id.* at 44, and that became even clearer with the remainder of the Court's analysis.

Moreover, *Kisor* deference, as the *Kisor* Court explained, comes into play only when agencies are *interpreting* their regulations. But the Sentencing Guidelines provide a broader role for commentary, as recognized in *Stinson*. *See* 508 U.S. at 44. As the Guidelines themselves provide, commentary was provided not only to interpret Guidelines but also to "*explain how [they are] to be applied*." U.S.S.G. § 1B1.7 (emphasis added). And as the *Stinson* Court explained, commentary "provides concrete guidance as to how even unambiguous guidelines are to be applied in practice," 508 U.S. at 44, and it helps ensure that each Guideline is applied in a manner most "consistent with the Guidelines Manual as a whole as well as the authorizing statute," *id.* at 45; *see also Allen*, 909 F.3d at 674 ("The Guidelines necessarily are structured at a level of generality that permits their application to the many varied facts and circumstances presented in the sentencing process. In this context, the commentary puts 'flesh on the bones' of the Guidelines" (citation omitted)). Indeed, the commentary's particularized role in this regard supported *Stinson*'s holding that commentary is authoritative and binding, regardless of whether the Guideline is ambiguous, except when inconsistent with the Constitution, federal statute, or the Guideline.

Taking the issue more broadly, a central overarching purpose of the Sentencing Reform Act and its creation of "an independent commission in the judicial branch" was for that commission to "establish sentencing policies and practices for the Federal criminal justice system that . . . provide certainty and fairness in meeting the purposes of sentencing" and that "avoid[] *unwarranted sentencing disparities* among defendants with similar records who have been found guilty of similar criminal conduct."  28 U.S.C. § 991(a), (b)(1)(B) (emphasis added).  And the Sentencing Commission *promulgated commentary* specifically to satisfy that purpose, relying on its commentary to amplify and explain how the Guidelines are to be applied.  *See* U.S.S.G. § 1B1.7.

Were we now to relegate commentary to a status where it could be considered only when the relevant Guideline is genuinely ambiguous, we would negate much of the Commission's efforts in providing commentary to fulfill its congressionally designated mission.  Doing so would impose such a burden on the use of commentary that, in many cases, district judges would be unable to consult it, thus denying them the benefits of the substantive explanation that both Congress and the Commission intended for them to have.  In addition, the application of *Kisor* to Guidelines commentary would undoubtedly lead to substantial litigation and divisions of authority regarding the extent to which each Guideline is "genuinely ambiguous," even after "all the traditional tools of construction" have been "exhaust[ed]."  *Kisor*, 139 S. Ct. at 2415 (cleaned up).  The surely resulting circuit splits would substantially increase the extent to which the advisory sentencing ranges for similarly situated offenders would be calculated differently — sometimes

dramatically so — depending on the circuit in which they were convicted. Such a result would vitiate the core purpose of the Sentencing Reform Act.

Finally, it is noteworthy that *Kisor* did not purport to overrule *Stinson*, and it is not our role to say it did. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("Despite what [one circuit judge] aptly described as [the] 'infirmities, and . . . increasingly wobbly, moth-eaten foundations' [of a prior Supreme Court decision,] . . . [t]he Court of Appeals was correct in applying [it] despite [its] disagreement with [the prior decision], *for it is this Court's prerogative alone to overrule one of its precedents*" (emphasis added) (cleaned up)); *see also Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021), *cert. denied*, No. 21-617, 2021 WL 5869448 (U.S. Dec. 13, 2021) ("[A]s an inferior court, the Supreme Court's precedents do constrain us[,] . . . . [and] [i]t is beyond our power to disregard a Supreme Court decision, even if we are sure the Supreme Court is soon to overrule it").

At bottom, we hold that Guidelines commentary is authoritative and binding, regardless of whether the relevant Guideline is ambiguous, except when the commentary "violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of," the Guideline. *Stinson*, 508 U.S. at 38. And having concluded that *Stinson* continues to provide "the standard that governs the decision whether particular interpretive or explanatory commentary is binding," *id.* at 43, we readily conclude that Application Note 5(C) is owed controlling deference.

While § 1B1.3(a)(2) specifies that, with respect to certain offenses, including drug-trafficking offenses, "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction" are relevant conduct for purposes

20

of sentencing a defendant, Application Note 5(C) explains that "offense conduct [that was] associated *with a sentence that was imposed prior* to the acts or omissions constituting the instant federal offense (the offense of conviction) is *not considered as part of the same course of conduct* or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) & cmt. n.5(C) (emphasis added). Application Note 5(C) thus "provides concrete guidance as to" § 1B1.3(a)(2)'s application and, in particular, ensures that the relevant conduct guideline is applied in a manner "consistent with the Guidelines Manual as a whole." *Stinson*, 508 U.S. at 44–45. It certainly "does not run afoul of the Constitution or a federal statute, and it is not plainly erroneous or inconsistent with" § 1B1.3. *Id.* at 47 (cleaned up). As a result, Application Note 5(C) authoritatively excludes from relevant conduct the 2013 conviction for which Moses had been sentenced prior to the acts and omissions constituting his offenses of conviction here. We therefore reject Moses's argument that the district court erred by relying on Application Note 5(C) to § 1B1.3 when it calculated his advisory sentencing range under the Guidelines.

## III

Moses also contends that even if the district court correctly calculated his advisory sentencing range as 151 to 188 months' imprisonment, his 120-month sentence of imprisonment was substantively unreasonable given that the instant federal crimes for which he was being sentenced involved his distribution of "less than *one-half of a gram* of crack cocaine." He refers to language in *Booker* stating that the Guideline system retains "a strong connection between the sentence imposed and the offender's real conduct,"

21

543 U.S. at 246, and he argues that "[a] sentence imposed through rote application of the career offender enhancement has nothing to do with an offender's real conduct."  He also claims that the career-offender enhancement has been the subject of "serious criticism from courts and relevant commentators over the years."

The presentence report prepared for Moses's sentencing calculated his sentencing range, after application of the career-offender enhancement of § 4B1.1, as 151 to 188 months' imprisonment.  At the sentencing hearing, Moses objected vigorously to that proposal as too severe for the conduct involved, stating:

> [A]t the end of the day, we're talking about less than a half gram of a drug, and . . . does that really warrant over 12 years in prison?  Our position is it doesn't, even with somebody with a bad record.  And we're asking you to go below that amount in sentencing him here today.

In asking the court for a downward variance, however, Moses did not propose a specific sentence.  Rather, when asked by the court "where [he] [thought] the Court should go," his counsel stated, "I leave that to your discretion.  Again, I've been careful about trying not to put a number there because I'm not sure what that number is, personally.  But I think it's less than 151, [and] I think it's more than 30.  And ultimately I'll leave that up to you and your wisdom."

The district court agreed with Moses and granted him a downward variance, stating, "what I'm thinking about is the motion for downward variance premised on the amount of the drug and the other arguments the defendant raises with respect to the 2009 conviction." The court then sentenced Moses to 120 months' imprisonment, which, it said, was "sufficient but not greater than necessary."

22

Because the district court granted Moses precisely what he requested, it is bold, perhaps even inappropriate, for him now to ask us to conclude that the district court abused its discretion by failing to impose a greater variance. Yet, Moses does just that, although he provides scant support for the argument.

In the Sentencing Reform Act, Congress specifically directed the Sentencing Commission to ensure "that the guidelines specify a sentence to a term of imprisonment *at or near the maximum term* authorized for categories of defendants in which the defendant is" (1) at least 18 years old, (2) "has been convicted of a felony that is" a crime of violence or a controlled substance offense, and (3) "has previously been convicted of two or more prior felonies" for a crime of violence or a controlled substance offense. 28 U.S.C. § 994(h) (emphasis added). Of course, even with that congressional directive, the district court was also required to consider all of the § 3553(a) sentencing factors in selecting a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing, as articulated in the Sentencing Reform Act. 18 U.S.C. § 3553(a).

In this case, the district court imposed a sentence consistent with these statutory directives, specifically taking into account, among other things, the requirements for career-offender status, the small quantity of crack cocaine involved in the instant offenses, Moses's arguments regarding his 2009 convictions, and his very serious criminal history. After conducting an individualized assessment, the court selected a sentence of imprisonment that was 31 months lower than the bottom of the advisory guidelines range.

Given the level of deference that we owe to district courts' sentencing judgments and the presumption of reasonableness that attaches to sentences within or below the

23

Guidelines' advisory sentencing range, *see United States v. Susi*, 674 F.3d 278, 289 (4th Cir. 2012), we cannot conclude that the district court imposed a substantively unreasonable sentence here.

The judgment of the district court is accordingly

AFFIRMED.

KING, Circuit Judge, dissenting in part and concurring in the judgment:

I write separately to briefly explain my disagreement with my friends of the panel majority in this appeal.

On January 7, 2022, another panel of this Court published a unanimous opinion in *United States v. Campbell*, No. 20-4256 (4th Cir. Jan. 7, 2022), authored by our good colleague Judge Motz. The legal analysis of the panel majority in this case conflicts with the *Campbell* precedent in concluding that the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), is inapplicable. Crucially, no panel of this Court is entitled to circumscribe or undermine an earlier panel decision. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting en banc or the Supreme Court."); *see also United States v. Williams*, 808 F.3d 253, 261 (4th Cir. 2015); *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021). Moreover, I am entirely persuaded of the correctness of the analysis set forth by Judge Motz in the *Campbell* decision.

I therefore dissent from those aspects of the panel majority's opinion that conflict with *Campbell*. Nevertheless, because I agree with the result reached by the panel majority, I concur in the judgment.